UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

LINZIE J. LEDBETTER

        Plaintiff,

    v.

SHAWN FREEMAN, JIMMY LEADINGHAM,
DARLA HARRIS, CHRISTINA GARRETT,
GENE TURK, and JACKSON COUNTY MASS
TRANSIT DISTRICT,

        Defendants.

Case No. 23-cv-3394-JPG

## MEMORANDUM AND ORDER

This matter comes before the Court on the motion for summary judgment filed by defendants Shawn Freeman, Jimmy Leadingham, Darla Harris, Christina Garrett, and Jackson County Mass Transit District ("JCMTD"; collectively, "County Defendants") (Docs. 45, 46, & 47). Plaintiff Linzie J. Ledbetter has responded to the motion (Docs. 58, 59, & 60), and the County Defendants have replied to that response (Docs. 61 & 62). Ledbetter has also filed a motion suggesting the County Defendants' motion and reply briefs exceed the page limits (Doc. 63), and the County Defendants have responded to that motion (Doc. 64). Because no reasonable jury could find for Ledbetter if this case were to go to trial, the Court will grant the County Defendants' summary judgment motion.

## I.    Page Limits

As a preliminary matter, the Court addresses the page limitation questions raised by Ledbetter's motion (Doc. 63). He first complains that the County Defendants have filed a four-page summary judgment motion, a twenty-three page memorandum in support of the motion, and a fifteen-page statement of undisputed material facts ("SUMF"). The County Defendants

point out that Local Rule 7.1 only limits the size of the brief in support of a summary judgment motion—here labeled as a memorandum—to twenty pages but does not limit the length of the motion itself or the SUMF. SDIL-LR 7.1(a)(3) (explicitly excluding the SUMF from the brief page limit),  And they received advance permission to file a twenty-three-page brief (Doc. 44). Because the County Defendants are correct, the Court finds their motion papers are not overly long.

Ledbetter also complains that the County Defendants have filed two replies, one five pages and the other eleven pages, which appears to be an end-run around the five-page limit on reply briefs.  *See* SDIL-LR 7.1(a)(4).  However, upon closer inspection, the eleven-page filing is actually a reply to Ledbetter's statement of additional material facts ("SOAMF"), which is allowed without page limitation.  SDIL-LR 56.1(d), (e).  The County Defendants' reply brief (Doc. 61) and reply to Ledbetter's SOAMF (Doc. 62) are not overly long.

For these reasons, the Court will deny Ledbetter's motion (Doc. 63).

## II.    Standard for Summary Judgment

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000).  The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396.  Nevertheless, the "favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture."  *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017) (internal

quotations and citations omitted).

The initial summary judgment burden of production is on the moving party to show the Court that there is no reason to have a trial. *Celotex*, 477 U.S. at 323; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). Where the nonmoving party carries the burden of proof at trial, the moving party may satisfy its burden of production in one of two ways. It may present evidence that affirmatively negates an essential element of the nonmoving party's case, *see* Fed. R. Civ. P. 56(c)(1)(A), or it may point to an absence of evidence to support an essential element of the nonmoving party's case without actually submitting any evidence, *see* Fed. R. Civ. P. 56(c)(1)(B). *Celotex*, 477 U.S. at 322-25; *Modrowski*, 712 F.3d at 1169. Where the moving party fails to meet its strict burden, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 322-26; *Anderson*, 477 U.S. at 256-57; *Modrowski*, 712 F.3d at 1168. A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

The remaining claims in this case are, as set forth in the Court's May 9, 2024, order dismissing some claims (Doc. 29), claims under:

- Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., against JCMTD for a hostile work environment on the basis of race and sex;

- the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and § 504 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794, against JCMTD for failure to accommodate Ledbetter's need for a driver route that did not require wheelchair transfers and for retaliating against him for filing the January 2023 EEOC charge by increased discipline and failing to make him a driver; and

- the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, against the County Defendants for willfully failing to return him to his position of driver after he took FMLA leave in 2021 and for retaliating against him for using FMLA leave.

The Court now turns to the facts relevant to those claims.

## III.    Facts

Viewing all evidence and drawing all reasonable inferences in Ledbetter's favor, the evidence established the following relevant facts.[1]

### A.    JCMTD

As its name suggests, JCMTD provides transportation services to the public in Jackson County, Illinois. Some of its vehicles run on regular, fixed routes where anyone can board, and it is hard to predict when a wheelchair-bound passenger will want to ride on one of these fixed routes. Some JCMTD vehicles provide specially arranged transportation for passengers who call to schedule pick-ups and drop-offs. JCMTD employs drivers to drive its vehicles and dispatchers to schedule special transportation services and send vehicles to the appropriate locations.

---

[1] Ledbetter attempts to testify in his brief, statement of facts, and interrogatory questions, but such statements are not sworn such that they could be considered in opposition to a summary judgment motion. At the summary judgment stage—the "put up or shut up moment in the life of a case," *AA Sales & Assocs. v. Coni-Seal, Inc.*, 550 F.3d 605, 612 (7th Cir. 2008) (internal quotations omitted)—the evidence presented must be admissible at trial. *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016). Ledbetter's unsworn statements would not be, so the Court cannot consider them on summary judgment. *See Pfeil v. Rogers*, 757 F.2d 850, 859 (7th Cir. 1985).

The JCMTD is a paratransit agency under 49 C.F.R. § 37.121 and regularly transports wheelchair-bound passengers and others who cannot use regular public transportation.  On a daily basis, a JCMTD driver must assist wheelchair-bound passengers with transfers to appropriate accommodations in the JCMTD vehicle, which requires a driver to maneuver, secure, and strap in wheelchair-bound passengers.  Those abilities and the ability to lift fifty pounds are listed as special qualifications in the driver and the dispatcher job description.  However, the dispatchers do not have to perform wheelchair transfers because they are only asked to drive in emergency situations.

B.      Ledbetter's Injuries

Ledbetter, a Black male, began working for JCMTD in September 2012.  In 2016, he injured his back while performing a wheelchair transfer and required back surgery.  As a result of his injury, he was subject to permanent medical restrictions that precluded him from performing the lifting and movements necessary to perform wheelchair transfers.  He returned to work in late 2018 and was allowed to drive without performing wheelchair transfers.[2]

Ledbetter was injured again in January 2021, this time not at work.  He burned his foot by soaking it in hot water.  He asked JCMTD to take FMLA leave for his foot injury, and JCMTD allowed him to take the leave beginning January 11, 2021.

---

[2] Ledbetter asserts that he was allowed to be a driver despite his medical restrictions, but he has not pointed to evidence in support of this assertion as is required at the summary judgment stage of the case.  Nevertheless, evidence cited elsewhere, namely, Ledbetter's deposition testimony that, when he was a driver, defendant Dispatching Supervisor Darla Harris would be disappointed that schedule changes needed to be made because of his back injury, suggests the fact is true.  A reasonable jury could conclude from that statement that Ledbetter had been allowed before 2021 to drive without making wheelchair transfers.  Ledbetter also told the JCMTD Board of Trustees that, early in his employment, scuttlebutt had it that one driver was not required to perform wheelchair transfers because of an injury.  There is no competent evidence to establish such a fact.

C.    Freeman Takes Over

While Ledbetter was out on FMLA leave, the JCMTD leadership changed, and on February 1, 2021, defendant Freeman became the Executive Director of the agency.

In preparation for returning to work, Ledbetter attended the March 2021 meeting of the JCMTD Board of Trustees. At the meeting, he informed the Board that his physical restrictions prevented him from performing wheelchair transfers and that those restrictions were permanent. He also said he would try to do any kind of job JCMTD had for him to do.

D.    Ledbetter's 2021 Return from FMLA Leave

Ledbetter returned to work on April 5, 2021, but instead of returning to his position as a driver, Freeman reassigned him to a dispatcher position. Freeman thought it was not feasible to allow Ledbetter to be a driver and exempt him from having to perform wheelchair transfers, a duty most drivers disliked. He believed Ledbetter could not drive a fixed route because it could not be predicted when a wheelchair-bound passenger would want to board the vehicle. If Ledbetter could not assist that passenger to board, the passenger would have to be denied service.[3] He also could not drive specially arranged routes because it was not always clear whether the passengers being picked up were in wheelchairs, and even if it were clear, there were not enough specially arranged routes not involving wheelchair-bound passenger to keep a full-time employee occupied.

Freeman memorialized his decision in a memorandum. There, he noted Ledbetter's inability to perform wheelchair transfers and that the dispatcher position did not require them. Further, he told Ledbetter he expected him to succeed as a dispatcher because defendant

---

[3] Ledbetter believes that service denial happens frequently for various reasons so should not be a reason to disqualify him as a driver.

6

Leadingham, the JCMTD Operations Manager, had reported that Ledbetter was detail-oriented and that he performed well doing light-duty administrative duties in 2018 after his workers' compensation leave.  Freeman noted that Ledbetter's pay would remain the same.  Ledbetter continued to work with the same coworkers and did not have to go through the standard probationary period.  Nevertheless, Ledbetter was not happy with the reassignment and wanted to be a driver.  He had personality conflicts with the other dispatchers, who he believed were unprofessional and petty, and he did not want to learn the technical parts of the dispatcher job.[4] He just liked driving.

On May 13, 2021, Ledbetter asked Operation's Manager Leadingham about the dispatcher job description, which also contained the same "special qualifications" as the driver job description—the ability to perform wheelchair transfers and lift fifty pounds.  In response to his concerns, Freeman told Ledbetter that dispatchers were only required to drive vehicles in an emergency, so driving—and the ability to perform wheelchair transfers and lift fifty pounds— were not essential functions of the dispatcher job.  He also told Ledbetter that, as a reasonable accommodation, he would be exempt him from performing wheelchair transfer duties under the dispatcher "special qualifications."  The accommodation was memorialized in a written memorandum.  Ledbetter signed an acknowledgement of the dispatcher job description with a special note incorporating Freeman's accommodation memorandum.  Indeed, Ledbetter has not been required to perform any wheelchair transfers as a dispatcher.

By December 2021, it had become apparent that Ledbetter needed to improve in several aspects of the dispatcher job.  On December 14, 2021, Dispatching Supervisor Harris spoke to

---

[4] In his brief, he attributes these personality conflicts to defendants Harris and Lead Dispatcher Christina Garrett but provides no evidence in support of that speculation.

Ledbetter about his need to multitask and to prioritize responding to driver radio calls over client telephone calls. No official discipline was received as a result of this criticism.

Ten months later, in early October 2022, Ledbetter made another mistake. He incorrectly scheduled a ride for a client, and it took him an excessively long time on the phone to correct the error. Ledbetter acknowledged his mistakes. Long calls had been a persistent problem for Ledbetter as noted in his yearly evaluation, and Harris had provided tips on how to be more efficient with scheduling rides so other callers could get through on the telephone line. At his yearly evaluation, he was also given an aspirational goal to complete each call within seven minutes. On October 26, 2022, Harris gave Ledbetter a verbal warning for the scheduling error and for the length of the rescheduling call.[5] The same day, Ledbetter visited his doctor because he was anxious and agitated by the reprimand and thought he was going to be fired.

The following day, October 27, 2022, Ledbetter again saw his doctor and reported being depressed from the reprimand and stressed from his job. His doctor found his blood pressure was high. Ledbetter asked to take FMLA leave, and JCMTD approved the request. That evening, he also raised his concerns at a JCMTD Board meeting.

E.    Ledbetter's 2023 Return from FMLA Leave

Ledbetter remained out on FMLA leave until January 9, 2023, when he returned to his dispatcher position. He could have stayed out longer but felt ready to return. The day after his return, he met with Freeman, Leadingham, and Harris and asked them to let him be a driver again if a doctor cleared him to perform wheelchair transfers, but JCMTD refused to change its mind. Ledbetter became emotional, so JCMTD allowed him to go home for the day.

---

[5] Ledbetter asserts without any evidence that he was written up for mistakes that every dispatcher made without being written up. The Court cannot consider this unsworn speculation on summary judgment.

The next day, January 11, 2023, Ledbetter filed a charge with the EEOC (Charge No. 560-2023-00873) alleging discrimination on the basis of his disability by failing to return him to the position of driver.  The EEOC recommended the Ledbetter's claim be dismissed and on January 31, 2023, issued him a Right to Sue Letter.  Ledbetter did not file a lawsuit within 90 days of receiving that letter.

Ledbetter continued to work for JCMTD.  In mid-May 2023, Ledbetter again had an excessively long call and made some scheduling mistakes that caused JCMTD to lose a fee.  Harris issued him a written warning about those incidents.  Ledbetter offered to pay the missed fee, but Freeman did not accept the offer.  Several days later, Ledbetter had his performance review; scheduling and responsiveness to radio calls were identified as problem areas.  He received the results of that review on June 1, 2023.

In the meantime, Ledbetter's performance began declining.  Sometimes when other dispatchers got to work before him and he was not aware of what was going on, he would wait and allow other, more informed dispatchers to answer radio calls.  On June 12, he scheduled a ride for the wrong day; on June 13, he scheduled a return ride on the wrong route; and on June 22, a client complained about how Ledbetter treated him on the telephone.  Harris issued Ledbetter a final written warning on June 28, 2023.  Nevertheless, Ledbetter is still employed by the JCMTD to this day.

Ledbetter filed a second EEOC charge on July 7, 2023 (Charge No. 560-2023-02375), indicating he had experienced discrimination on the basis of disability, race, and sex, and had experienced retaliation.  In the narrative description of his claim, he asserted that JCMTD retaliated against him for his January 2023 EEOC charge by disciplining him and failing to reinstate him as a driver.  He also asserted JCMTD had hired numerous employees outside his

protected group as drivers, and promoted Garrett to Lead Dispatcher instead of him.  He also complained that since her promotion, Garrett had created a hostile work environment for him.  Again, the EEOC declined to pursue his case and issued him a Right To Sue Letter dated July 11, 2023.

Despite his allegations of discrimination and harassment, Ledbetter testified in his deposition that he understands the only reason the JCMTD has not allowed him to work as a driver is because of the medical restrictions from his back injury, not any other reason.

As for his work environment, he asserted that Harris used a different tone of voice with different people and that she was straight-to-the-point when she talked to him.  She has never said anything discriminatory about his race or sex.  Garrett also spoke to him differently than to others; she talked to him loudly, made smart, quirky comments, would not work with him, looked at him, made fun of him, and talked down to him but has never made any discriminatory comments to him based on race, sex, or disability.  Ledbetter also admitted that sometimes he himself responded harshly to his coworkers.

Ledbetter filed this lawsuit on October 16, 2023, within 90 days of receiving the right-to-sue letter for his July 7, 2023, charge.

## III.    Discussion

### A.    Title VII:  Hostile Work Environment

Ledbetter complains that JCMTD discriminated against him by creating a hostile work environment.  There is no evidence from which a reasonable jury could conclude that any harassment was because of his race or sex in violation of Title VII.

Title VII prohibits discrimination on the basis of race and sex:  "It shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual,

or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . [or] sex. . . ." 42 U.S.C. § 2000e-2(a)(1). The race and sex discrimination prohibited by Title VII includes racial or sexual harassment that creates a hostile work environment. *See Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 64 (1986) (sex); *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) (sex); *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 895-96 (7th Cir. 2016) (race).

A hostile work environment in violation of Title VII is created "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or [pervasive] to alter the conditions of the victim's employment and create an abusive working environment." *Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018) (internal quotations omitted). In order to survive summary judgment, a plaintiff must point to evidence that "(1) the work environment was both objectively and subjectively offensive; (2) the harassment was based on membership in a protected class or in retaliation for protected behavior; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016); *accord Abrego*, 907 F.3d at 1015. Harassment must be "sufficiently connected" to race or sex so that it can be reasonably construed "as being motivated by the defendant's hostility to the plaintiff's race [or sex]." *Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1159 (7th Cir. 2014) (internal quotations omitted). To determine if conduct is severe or pervasive enough, the Court considers "the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance." *Boss*, 816 F.3d at 920. The Court considers the totality of the circumstances to determine whether there is evidence from which a reasonable jury could find Ledbetter was subject to a hostile work

11

environment because of his race or sex.  *Id.*; *Abrego*, 907 F.3d at 1015.

JCMTD challenges Ledbetter's ability to present satisfactory evidence on the first, second, and third elements, that is, that the any offensive conduct Ledbetter experienced was objectively offensive, was because of his race or sex, and was serious enough to alter the terms and conditions of Ledbetter's employment.[6]

The Court starts with the second element—harassment *because of* race or sex—which is dispositive of his claim.  It is true that Ledbetter experienced working conditions he found unpleasant due in large part to Harris's and Garrett's treatment of him.  They talked to him differently than they did to other employees, made smart-aleck comments, sometimes did not work with him, sometimes look at him, talked down to him, and made fun of him.  While this might not have been the most comfortable work environment for Ledbetter, there is no evidence from which a reasonable jury could find any of this offensive conduct was based on his race or sex.  Even if their conduct could be viewed as pervasive enough to create a hostile environment, neither Harris nor Garrett made any reference to Ledbetter's race or sex, and there are no other circumstances that would suggest race or sex was the reason for their treatment of Ledbetter.  The facts that Ledbetter is a Black man and it happened to him are not enough for a jury to find the conduct was *because* he was a Black man.  *See Beamon v. Marshall & Ilsley Tr. Co.*, 411 F.3d 854, 863 (7th Cir. 2005) ("[N]ot every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a

---

[6] Ledbetter objects to this and other arguments on the grounds that the County Defendants did not plead these arguments as affirmative defenses in their Answer.  They did not include them in their Answer because they are not affirmative defenses, which are reasons the plaintiff cannot prevail even if he proves the elements of his case.  *See* Defense, Affirmative defense, *Black's Law Dictionary* (12th ed. 2024).  On the contrary, these arguments challenge Ledbetter's ability to prove the elements of his case.

racial minority.").  Ledbetter's claim fails on this account.

To the extent Ledbetter might object that Harris's and Garrett's conduct was in retaliation for exercising his rights under Title VII to complain of race or sex discrimination, there is no evidence he exercised rights under that statute at any time before their conduct began.  His earlier complaints were about disability discrimination and the FMLA, not race or sex discrimination.

Finally, it is clear that evidence not considered because it did not meet the strict requirements of SDIL-LR 56.1 would not change this conclusion.  Lest the reader think recruitment of counsel would have assisted Ledbetter to put his evidence in admissible form by, say, plunking it into an affidavit and filing it in compliance with the local rules, the involvement of counsel would not have had a reasonable chance of making a difference in the disposition of this claim or any other claim in this case.  Even if the Court had considered Ledbetter's assertions regarding matters about which he had first-hand knowledge and could testify competently about, the Court would still find a lack of causation evidence to establish a hostile work environment because of Ledbetter's race or sex.

For these reasons, JCMTD is entitled to summary judgment on Ledbetter's Title VII hostile environment claim.

    B.    <u>ADA and RA</u>

        1.    <u>Failure to Accommodate</u>

Ledbetter complains that JCMTD failed to accommodate his back injury by allowing him to be a driver without requiring him to perform wheelchair transfers.  JCMTD contends it owed Ledbetter no duty to accommodate him in a driver position by exempting him from performing wheelchair transfers because that duty was an essential job function.  It further contends that its

making Ledbetter a dispatcher was a reasonable accommodation for his back disability.

The ADA provides, in pertinent part, that an employer shall not "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

It further describes discrimination to include:

> not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity,

42 U.S.C. § 12112(b)(5)(A). The standards applicable to claims under the RA are the same as the standards under the ADA except that under the RA the plaintiff must also prove that he was involved in a program which received federal financial assistance. *Jackson v. City of Chi.*, 414 F.3d 806, 810 n. 2 (7th Cir. 2005) (citing *Silk v. City of Chi.*, 194 F.3d 788, 798 n. 6 (7th Cir. 1999)); *see* 29 U.S.C. § 794(d). Therefore, although the Court makes explicit reference only to the ADA in this section, its analysis applies equally to Ledbetter's RA claims.

To establish a failure to accommodate claim under the ADA, a plaintiff must prove that "(1) plaintiff was a qualified individual with a disability; (2) defendant was aware of his disability; and (3) defendant failed to accommodate his disability reasonably." *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019) (citing *EEOC v. AutoZone*, 809 F.3d 916, 919 (7th Cir. 2016)). The ADA defines a "qualified individual" to mean "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position. . . ." 42 U.S.C. § 12111(8). Deference is given to an employer's judgment about what functions are essential to a job, and a job description including a function is evidence the

function is essential to the job.  *Id.*  However, other factors may also bear on whether a function is essential to a job: "the amount of time spent on a function, the experience of those who previously or currently hold the position, and the consequences of not requiring the employee to perform the function."  *Kotaska v. Fed. Express Corp.*, 966 F.3d 624, 628 (7th Cir. 2020).

JCMTD argues that no reasonable jury could find that wheelchair transfers are not an essential function of the job of driver.  Since Ledbetter has physical restrictions that prevent him from performing wheelchair transfers, JCMTD argues Ledbetter cannot perform an essential job function and is therefore not a qualified individual for whom reasonable accommodations must be made.  Ledbetter suggests that performing wheelchair transfers is not an essential job function because in the past, before Freeman became Executive Director, he was allowed to be a driver without performing them.

No reasonable jury could find performing wheelchair transfers was not an essential function of the driver job.  As Executive Director, Freeman determined in early 2021 it was an essential function, and that duty was included in the job description for a driver.  Further, drivers were actually required to performed wheelchair transfers every day both on the fixed routes and on specially arranged routes, and no driver was exempt from that requirement under Freeman's leadership.  In Freeman's judgment, it would compromise JCMTD's ability to serve wheelchair-bound passengers if a driver were allowed to refuse a passenger simply because the driver was incapable of securing them on the vehicle.  Then the agency would be burdened with having to arrange another driver to deviate from his or her scheduled route to pick up the passenger.  It would also burden other employees to exempt one driver from a duty other drivers disliked and to require dispatchers to schedule around a driver who could not perform wheelchair transfers.  And there was simply not enough work to keep a full-time driver employed if they could not

15

perform wheelchair transfers.  These are legitimate operational concerns for a paratransit agency.

Ledbetter contends wheelchair transfers cannot be an essential function because he was allowed to be a driver from late 2018 to January 2021 without being required to perform them. However, this is not to enough to overcome the evidence that drivers needed to frequently perform wheelchair transfers, that wheelchair transfers were listed as an essential job duty in the driver job description, that one of the main functions of the agency itself was to provide paratransit services, and that Freeman believed it would cause operational problems were Ledbetter to be exempt from wheelchair transfers.  It might be true that a prior agency leader bent over backwards to accommodate Ledbetter's back disability by excusing him from an essential function, but that does not mean the ADA requires such measures.  On the contrary, "the ADA does not impose an obligation on employers to create a new position, which contains a subset of the duties performed by those in an existing position, for individuals with permanent impairments." *Kotwica v. Rose Packing Co., Inc.*, 637 F.3d 744, 750 (7th Cir. 2011) (citing *Watson v. Lithonia Lighting,* 304 F.3d 749, 752 (7th Cir. 2002)).  That is what Ledbetter was asking JCMTD to do because he was unable to perform the essential function of performing wheelchair transfers.

By Ledbetter's own admission, he cannot perform wheelchair transfers because of permanent medical restrictions on his physical activity given as a result of his 2016 back injury. Those restrictions are permanent.  As a consequence, he cannot perform an essential function of the driver job, so he is not qualified for that job.[7]

---

[7] It is irrelevant that at some point JCMTD refused to answer Ledbetter's hypothetical question whether it would hire him as a driver *if* he found a doctor willing to say he could perform the essential functions of that job.  That hypothetical did not exist after Ledbetter admitted his restrictions were permanent.

This conclusion remains true even in light of the fact that the same wheelchair transfer duties were listed on the dispatcher job description. Freeman has explained that, although dispatchers may be called on to perform those duties in rare instances, they are not actually called on to do those duties on a regular basis. Consequently, they are not essential to the job of dispatcher. Indeed, Freeman excused Ledbetter from performing those duties in his position of dispatcher.

Again, this conclusion would not change even if Ledbetter would have been able to put other asserted evidence—like another driver who was excused from wheelchair transfers because of a wrist injury—into a form that would be considered by the Court on summary judgment. The exception for that driver occurred early in Ledbetter's tenure with JCMTD and long before Freeman decided in April 2021 that JCMTD would not excuse Ledbetter from that function. An agency's willingness to go above and beyond what the ADA requires in two circumstances over many years and under different management will not bind the agency to forever make such an accommodation.

Finally, to the extend Ledbetter was disabled and was qualified to perform the essential functions of a dispatcher, JCMTD reasonably accommodated his disability in that position by exempting him from the occasional duty of performing wheelchair transfers.

For the foregoing reasons, JCMTD is entitled to summary judgment on Ledbetter's ADA and RA failure to accommodate claims.

### 2. <u>Retaliation</u>

Ledbetter complains that JCMTD retaliated against him for complaining of the aforementioned alleged failure to accommodate in his January 2023 EEOC charge. He claims that retaliation came in the form of increased discipline and failure to make him a driver.

JCMTD points out that the alleged retaliatory acts occurred *before* Ledbetter's EEOC charge, so they could not possibly have been in retaliation for filing that charge. The temporal sequence does not fit with retaliation.

In addition to the discrimination described in the previous section, the ADA forbids retaliation: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).

In order to prove a claim for retaliation in violation of the ADA, a plaintiff must prove he engaged in activity protected by the ADA, that he suffered adverse action, and that the adverse action was caused by the protected activity. *Rowlands v. United Parcel Serv.*, 901 F.3d 792, 801 (7th Cir. 2018). The element of causation requires a plaintiff to prove that, but for his protected activity, he would not have suffered the adverse consequence. *Id.* This is true even if the complaint constituting the protected activity had no merit. *Id.* Thus, the critical question is whether a reasonable jury could find that Ledbetter's complaints about not getting the accommodation he wanted in the driver job caused him to suffer an adverse action. *See id.* "Suspicious timing" and pretextual justifications offered by the employer are two bits of circumstantial evidence that can be used to show causation. *Rowland*, 901 F.3d at 802. The Court must consider the evidence as a whole to determine whether a jury could answer the critical question in the plaintiff's favor. *Johnson v. Advoc. Health & Hosps.*, 892 F.3d 887, 894 (7th Cir. 2018).

One of the retaliatory actions Ledbetter alleges is the failure to make him a driver. But JCMTD points out that it first failed to make him a driver in April 2021, long before January

18

2023, when he filed his first EEOC charge.  Additionally, Ledbetter admitted that the reason JCMTD failed to make him a driver was solely because of his medical restrictions that prevented him from performing wheelchair transfers, an essential function of that job.  Thus, his EEOC charge could not possibly have been the but-for cause of JCMTD's decision not to make Ledbetter a driver.

Ledbetter points to suspicious timing because he kept asking JCMTD to reconsider its decision even after his January 2023 EEOC charge, and it kept saying no.  But a plaintiff cannot create his own "suspicious timing" by repeating the same previously denied request after his protected activity.

There is no evidence from which a jury could find Ledbetter's January 2023 charge was the but-for cause of JCMTD's failure to make him a driver.  In light of this finding, the Court need not consider whether the transfer to the dispatcher position was an adverse action.

Ledbetter also alleges that he was subject to increased discipline was in retaliation for his January 2023 EEOC charge.  Again, he has a timing problem.  His first informal disciplinary action was Harris's meeting with him in December 2021 to talk about performance issues, and his first official discipline was the October 2022 verbal warning.  Both were long before he filed the EEOC charge.  The formal discipline followed mistakes Ledbetter conceded he made— scheduling a ride incorrectly and taking too long on the telephone to fix his mistake—and no evidence suggests any other reason for that discipline.

As for the discipline Ledbetter received *after* his January 2023 EEOC charge, he has a timing problem of a different sort.  Rather than the discipline preceding the alleged cause, it was too far after January 2023 to raise the suspicion of causation.  His further discipline was in May 2023 (a written warning after an excessively long call and scheduling mistakes) and June 2023 (a

final written warning after two scheduling mistakes and a complaint from a client).  These steps were far too long after the January 2023 EEOC charge for a reasonable jury to infer a causal connection, especially when Ledbetter admitted he actually made the mistakes that precipitated the discipline and they were of the same type he had made, and had been disciplined for, before. For timing alone to create an inference of causation, the adverse action must occur very soon— mere days—after the protected activity; two months is too long to create a reasonable causal inference.  *See Igasaki v. Ill. Dep't of Fin. & Prof'l. Reg.*, 988 F.3d 948, 959 (7th Cir. 2021). Ledbetter has not demonstrated JCMTD's proffered reasons were a pretext for retaliation and that Harris did not honestly believe he was making mistakes as a dispatcher.  Nor is there any other evidence to bolster the force of the timing factor to render it sufficiently suspicious to suggest causation.  Again, in light of the lack of causation evidence, the Court need not consider whether the discipline amounted to an adverse action.

Because no reasonable jury could find that JCMTD's failure to reinstate Ledbetter as a driver or that its discipline of Ledbetter was caused by his January 2023 EEOC charge, JCMTD is entitled to summary judgment on that count.

C.    FMLA

1.    Interference with Reinstatement Right

Ledbetter complains that the County Defendants willfully failed to reinstate him to his position of driver after he took FMLA leave in 2021 and retaliated against him for using FMLA leave.  The County Defendants contend that the two-year statute of limitations bars this action because it was not a willful violation of the FMLA, if it even was a violation.  If the two-year statute of limitations applies, Ledbetter's October 2023, FMLA claim in this case comes too late to complain about an April 2021 decision not to reinstate him as a driver.  JCMTD also denies

20

that he was prejudiced by any violation since he lost no pay or benefits and remains employed by the JCMTD.

The FMLA provides leave for qualified employees who must be absent from work for family or medical reasons.  29 U.S.C. § 2601 *et seq.*; *Price v. City of Fort Wayne*, 117 F.3d 1022, 1024 (7th Cir. 1997).  It also provides that an employee who takes FMLA leave "shall be entitled, on return from such leave—(A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment."  29 U.S.C. § 2614(a)(1).  It is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided."  29 U.S.C. § 2615(a)(1).  In order to prevail on such a claim, a plaintiff must prove "(1) he was eligible for the FMLA protections; (2) his employer was covered by FMLA; (3) he was entitled to take leave under FMLA; (4) he provided sufficient notice of [his] intent to take leave; and (5) [his] employer denied [him] FMLA benefits to which he was entitled."  *James v. Hyatt Regency Chi.*, 707 F.3d 775, 780 (7th Cir. 2013) (internal quotations omitted).  Importantly, Ledbetter does not assert that the County Defendants denied him any FMLA leave to which he was entitled.  Instead, his claim is that County Defendants violated the reinstatement provision of the FMLA when he returned to work in April 2023.  The Court therefore focuses on the fifth element— whether the County Defendants denied him a benefit to which he was entitled and whether they did so willfully.

In answering the first question, it is important to remember that the right to reinstatement is not absolute.  *Kohls v. Beverly Enterprises Wis., Inc.*, 259 F.3d 799, 804 (7th Cir. 2001).  A later subsection of § 2614 qualifies that right:  "Nothing in this section shall be construed to

entitle any restored employee to—(B) any . . . position of employment other than any . . . position to which the employee would have been entitled had the employee not taken the leave." 29 U.S.C. § 2614(a)(3).  In other words, an employee would not be entitled to come back to a position that they would not have held had they not taken FMLA leave.  That means "[e]mployers are under no obligation to restore an employee to his or her position if the employee is unable to perform the essential functions of the job."  *James*, 707 F.3d at 780-81 (employee released by doctor to return to work with restrictions incompatible with prior position).  In fact, "if an employee cannot perform an essential function of their original position because of a physical or mental condition, the employee has no right to restoration to a different position under FMLA."  *Id.* at 780.

The second question is whether any violation was willful.  The answer to this question will determine whether the claim is barred by the two-year statute of limitations for a negligent violation or the three-year statute of limitations for a willful violation.  *See* 29 U.S.C. § 2617(c)(1)-(2) (two-year limitations period for FMLA unless willful, where three-year limitations period applies).  The FMLA does not define "willful," but the Seventh Circuit Court of Appeals has found the word encompasses knowing or in reckless disregard of a plaintiff's statutory rights; voluntary; deliberate; and intentional.  *Sampra v. U.S. Dep't of Transp.*, 888 F.3d 330, 333 (7th Cir. 2018) (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988) (construing "willful" in Fair Labor Standards Act)).  In order for the three-year statute of limitations to govern, the plaintiff must  show that his employer "either knew the FMLA prohibited its conduct or showed reckless disregard for whether it did."  *Sampra*, 888 F.3d at 334.  Mere awareness that the FMLA "was in the picture" is not enough to establish willfulness.  *Id*.

Under this of "willful," Ledbetter has not pointed to evidence from which a reasonable jury could conclude that the County Defendants either knew their conduct in not reinstating Ledbetter to a driver position would violate the FMLA or showed reckless disregard.  That they intentionally took an action and that they knew the FMLA "was in the picture" are not enough.  But in light of the statutory language and caselaw holding that they did not need to reinstate him to the same position if he was not able to do the job, coupled with their placing him in the dispatcher job arguably satisfied the FMLA's reinstatement requirement.  He retained his pay and benefits in the dispatcher job, which appeared to qualify it as an "equivalent position."  29 U.S.C. § 2614(a)(1)(B).  No evidence shows that the County Defendants failed to at least try to comply with the FMLA, or if they fell short—the Court is not saying definitively that they did— that it was willful.  Thus, the two year statute of limitations applies, and Ledbetter's October 2023 FMLA claim, filed more than two years after the April 2021 decision not to reinstate him to the driver position, is time-barred.  Since there is insufficient evidence of willfulness, the Court need not consider whether there actually was a violation or whether Ledbetter suffered any harm.

### 2.    Retaliation

Ledbetter complains that the County Defendants retaliated against him for using FMLA leave in early 2021.  In addition to providing substantive rights to take leave and to obtain the same or equivalent position after returning from such leave, the FMLA prohibits retaliation against employees who take advantage of those rights or opposes any practice unlawful under the FMLA.  *See Anderson v. Nations Lending Corp.*, 27 F.4th 1300, 1307 (7th Cir. 2022).  To prove an FMLA retaliation claim, a plaintiff must prove "(1) the employee engaged in statutorily protected activity; (2) the employer took adverse action against the employee; and (3) the protected activity caused the adverse action."  *Freelain v. Vill. of Oak Park*, 888 F.3d 895, 901

(7th Cir. 2018). The protected action need not be the *only* reason for an adverse action, but it must at least be a substantial or motivating factor for the action. *Anderson*, 27 F.4th at 1307.

There is no question Ledbetter engaged in activity protected by the FMLA when he took leave for a burned foot. The County Defendants take issue with whether any adverse action was caused by his use of FMLA leave, that is, whether taking the leave was a substantial or motivating factor in that adverse action.

To the extent Ledbetter contends his assignment to the dispatcher position was in retaliation for taking FMLA leave in 2021, the evidence cannot support such an assertion. The evidence, including Ledbetter's own admission, shows that he could not perform wheelchair transfers, an essential function of the driver job, and that his permanent inability to perform this essential function was the reason for not returning him to that position. Additionally, the Executive Director changed, and Freeman was no longer willing to make unreasonable, disruptive accommodations beyond those required by the ADA to allow Ledbetter to drive while foisting the wheelchair transfer duty onto other drivers. Indeed, there is no evidence that Freeman allowed any other similarly situated employee—that is, someone who had not taken FMLA leave and was permanently restricted from performing wheelchair transfers—to be a driver for JCMTD at any time. There is simply no evidence to suggest Ledbetter's actual *taking* FMLA leave played any role whatsoever in the decision to make Ledbetter a dispatcher or that the Board or Freeman would have made any other decision had Ledbetter not taken FMLA leave at that time.

In fact, far from retaliating against Ledbetter for taking FMLA leave, the evidence suggests that JCMTD was instead generous to him by keeping him employed when, under the FMLA, it could have terminated him outright because he could no longer perform the job he had

24

before taking FMLA leave. *James*, 707 F.3d at 780 (stating "if an employee cannot perform an essential function of their original position because of a physical or mental condition, the employee has no right to restoration to a different position under FMLA").

To the extent Ledbetter contends disciplinary action when he was a dispatcher was in retaliation for taking FMLA leave in 2021, no reasonable jury could find that taking leave caused any such adverse action. The disciplinary action by Harris began in October 2022, eighteen months after Ledbetter returned from FMLA leave, so the temporal connection is not close enough to suggest retaliation. Further, Ledbetter admitted he made the mistakes for which he was disciplined and does not point to a similarly situated individual who had not taken FMLA who was treated any better than he was. The circumstances do not suggest the FMLA played any role in those actions.

To the extent Ledbetter contends Harris and Garrett created a hostile work environment in retaliation for his taking FMLA leave in 2021, again such a claim is unsupported by the evidence. As with his similar claim of race and sex hostility, there is simply no supporting evidence from which a reasonable jury could find any of Harris's or Garrett's offensive conduct was based on his use of FMLA leave. The evidence shows no reference by Harris or Garrett to Ledbetter's use of FMLA leave, and there are no other circumstances that would suggest his use of FMLA leave was the reason for their treatment of Ledbetter.

## IV. Conclusion

For the foregoing reasons, the Court:

- **DENIES** Ledbetter's motion concerning the reply brief (Doc. 63);

- **GRANTS** summary judgment for the County Defendant on all remaining claims against them (Doc. 45); and

- **DIRECTS** the Clerk of Court to enter judgment accordingly at the close of the case.

The Court reiterates that it firmly believes appointment of counsel—who could have assisted Ledbetter in putting his allegations into an acceptable format for consideration on summary judgment—would not have had a reasonable chance of making a difference in the outcome of this case.  Where allegations might have been admissible and relevant to the disposition of a claim, the Court has tried to consider them as if they had been in proper affidavit form.

The Court will set a telephone status conference to schedule the final pretrial conference and trial for the claims against defendant Gene Turk.

**IT IS SO ORDERED.**
**DATED:  August 11, 2025**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**

26